IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CHARLES McGUIRE,                    §
                                    §
        Plaintiff,                  §      CIVIL ACTION NO. 1:07 CV 00683
                                    §
v.                                  §
                                    §
CIRRUS DESIGN, INC., JEFFREY        §
NELSON, UNIVERSITY OF NORTH         §
DAKOTA AEROSPACE FOUNDATION;        §
                                    §
        Defendants.                 §

DEFENDANTS' OPPOSED JOINT MOTION TO EXCLUDE THE TESTIMONY
OF PLAINTIFF'S PROFFERED EXPERTS PURSUANT TO
FEDERAL RULE OF EVIDENCE 702

INTRODUCTION

Defendants Cirrus Design Corporation ("Cirrus"), Jeffrey Nelson ("Nelson") and University of North Dakota Aerospace Foundation ("UNDAF"), jointly move to exclude the opinion testimony and reports, or portions thereof as set forth in more detail below, of Stan V. Smith, Ph.D. (proffered as a hedonic damages economist expert); Thomas D. Thunder (proffered as an audiologist expert); Douglas Carmody (proffered as a pilot expert); Craig Lichtblau, M.D. (proffered as a physical medicine and rehabilitation expert); Adrienne Bond (proffered as an expert on Texas law); and Kenneth McCoin (proffered as an economist expert). Defendants also move to exclude the testimony of Dr. Mark. R. Brinker, who is listed as an expert in Plaintiff's Expert Designation, but for whom no expert report, qualifications, or list of prior cases was provided as Required by Fed. R. Civ. P. 26(a)(2)(B). A copy of Plaintiff's Amended Expert Disclosures and

Designation Pursuant to Fed. R. Civ. P. 26 ("Expert Disclosure") is attached hereto as Exhibit "A."   It should be noted that the defendants have not yet deposed plaintiff's purported experts and therefore reserve the right to supplement this motion upon completion of those depositions.

## I. Legal Standard

1.1    Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that proffered expert testimony is both reliable and relevant. Fed.R.Evid. 702.   Rule 702 states that:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

1.2    The Court also has discretion to determine whether expert testimony will help the trier of fact. In utilizing that discretion the District Court "must ensure that an expert does not testify as to the governing law of the case." *Berkeley Inv. Group v. Colkitt*, 455 F.3d 195, 217 (3rd Cir. 2006); see also Anderson v. Suiters, 499 F.3d 1228, 1237 (10th Cir. 2007); *U.S. v. Moran* , 493 F.3d 1002, 1008 (9th Cir. 2007).   "Although [FRE] 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.   Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury." *Colkitt*, *supra.* at, 217; see also *Anderson v. Suiters,* 499 F.3d 1228, 1237 (10th Cir. 2007).

1.3     The test for determining the admissibility of expert opinions under Fed. R. Evid. 702 was announced by the Supreme Court in *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).   In *Daubert*, the Court held Rule 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony … is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.   Fed. R. Evid. 702 also expressly requires that the proposed expert testimony "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702.  *Daube*rt also stressed that while Fed. R. Evid. 702 is the "primary focus" of the District Court's gatekeeping role, a court "should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 590; 595.  Specifically, the court mentioned that a trial judge must consider Fed. R. Evid. 703 and 403 when determining whether an expert's testimony is admissible.  *Daubert*, 509 U.S. at 595.

1.4     Fed. R. Evid. 703 focuses on the data underlying an expert's opinion.  *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 747 (3d. Cir. 1994).   Experts may rely upon hearsay so long as that hearsay is of the kind normally employed by experts in the field. *Paoli*, 35 F.3d at 747.   However, it is for the trial judge to "conduct an independent evaluation into [the] reasonableness" of the expert's reliance upon the data.  *Paoli*, 35 F.3d at 748.   If the data underlying an expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.  *Paoli*, 35 F.3d at 748; *In re TMI Litig.*, 193 F.3d 613, 697 (3d. Cir. 1999).

1.5     The United States Court of Appeals for the Third Circuit elaborated on the requirements of Fed. R. Evidence 703 when dealing with experts testifying as to damages in *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d. Cir. 2000).  In *Elcock*, the court

reaffirmed a number of previous decisions holding that while mathematical precision was not required, expert damages testimony must be based upon a sufficient factual foundation to be submitted to a jury. *Elcock*, 233 F.3d at 754.   Appellant K-Mart Corporation challenged the admissibility of testimony from Appellee's expert economist, claiming that the economist relied upon improper assumptions regarding Ms. Elcock's level of disability, life expectancy and earning capacity before and after a slip and fall accident.  *Id.*   Specifically, K-Mart claimed that the expert economist inflated each of these figures, thus resting his opinion regarding damages on assumptions wholly lacking foundation in the record.  *Id.* The Third Circuit held that the District Court had abused its discretion by admitting the testimony of Ms. Elcock's economist due to the lack of factual support for his assumptions, which would result in "a jury [being] likely to adopt the gross figure advanced by a witness who has been presented as an expert." *Supra.* at 756. The *Elcock* court reasoned that for expert testimony to be admissible, the expert's opinion must be accompanied by "sufficient factual predicates" else it be no more than a "castle made of sand." *Elcock*,  233 F.3d at 755 (citations omitted).

## II.  Stan V. Smith, Ph.D. (Proffered Hedonic Damages Expert)

2.1    The testimony and report of plaintiff's purported hedonic damages expert, Stan V. Smith, Ph.D., should be excluded because his opinions are misleading, irrelevant and unhelpful to the jury under Fed R. Evid. 702, 703, 403 and *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993).  Copies of Dr. Smith's report, Curriculum Vitae and list of cases in which he testified are attached hereto as Exhibit "B-1", "B-2" and "B-3", respectively.

2.2     On August 25, 2008, plaintiff served the expert report of Stan V. Smith, Ph.D. ("Smith Report"), which was focused solely on a calculation of the value of the reduction in the plaintiff's loss of enjoyment of life as a result of his alleged injury.  Dr. Smith is an economist and the president of Smith Economics Group, Ltd.  His proffered testimony in this case consists exclusively of his attempt to quantify the plaintiff's alleged "reduction in value of life" through economics.

2.3     Despite Dr. Smith's assertions in his report, economic estimates of the value of "reduction in value of life" (also referred to as "loss of enjoyment of life" or "hedonic damages") like those made by Dr. Smith have not been widely accepted in the science of economics.  Not only have courts across the country previously determined that evaluating hedonic damages through an expert lacks *Daubert*-approved methodology, but other peer economists have also criticized such evaluations as unreliable and lacking in methodological rigor when used in personal injury litigation contexts.  Indeed, Dr. W. K. Viscusi, the leading authority cited by Dr. Smith for the proposition that his methodology should pass muster under *Daubert* actually says that it will not, as further explained below.

2.4     Consistent with Rule 702 and *Daubert,* the District Court must act as a gatekeeper to exclude unreliable, irrelevant and unhelpful expert testimony.  Fed. R. Evid. 702; Daubert., Inc., 509 U.S. 579.  Here, Dr. Smith offers opinions focused solely on the reduction in value of the enjoyment of life.   Such opinion testimony is equivalent to the testimony excluded by the court in *Elcock*, *supra*.  As discussed in detail below, this Court must dismiss Dr. Smith's report in its entirety and exclude his testimony because it is unreliable and unhelpful to the trier of fact.

### A.  Dr. Smith's Methodolgy and Opinions Fail under *Daubert*

2.5  Under the disguise of "science," Dr. Smith opines that he can provide the jury the tools by which they can calculate the value of life according to how much "we, as a contemporary society, actually pay to preserve the ability to lead a normal life." (Smith Report, p. 2)  Alluring and simple as it sounds, Dr. Smith and his model lack any foundation that courts and peer-reviewing economists determine as appropriate for the litigation context.  The model itself is unhelpful and confusing to a jury who can decide any question of hedonic damages without expert assistance.

2.6  Dr. Smith opines that the starting point for a "reduction in life" value for plaintiff is $4.1 million dollars, the value he assigns to Charles McGuire's life without any differentiation between his life and any other life.    (Smith Report, p. 3).  In his report, Dr. Smith identified this number as "[t]he central tendency of the range of the economic studies cited above."  (Smith Report, p. 3); see also *Kurncz v. Honda North Am., Inc.*, 166 F.R.D. 386, 388 (W.D. Mich. 1996) (District Court discussed in detail Dr. Smith's methodology in arriving at hedonic damages in the process of rejecting his testimony under *Daubert* because it did not "fit" under Rule 702 and was unduly prejudicial under Rule 703).  The kind of literature underlying Dr. Smith's study consisted of the following:

- o Consumer behavior and purchases of safety devices, such as the costs of smoke detectors and the lifesaving reduction associated with them (Smith Report, p. 3);

- o Wage risk premiums to workers, such as the differential rates of pay for dangerous occupations with a risk of death on the job (Smith Report, p. 3); and

- o Cost-benefit analyses of regulations, such as a government regulation that mandates smoke stack scrubbers at high-sulphur, coal-burning power plants (Smith Report, p. 3).

2.7     Those studies were all well conducted and peer-reviewed, but they did not study the estimation of hedonic damages.   Indeed, in a 1999 nationwide survey of forensic economists, a startling 76.41% of forensic economists stated that they were not willing to opine about hedonic damages in an injury case because, among other stated reasons, they believed that economists had not developed "sufficient agreement as to the appropriate methodology for such a calculation."   Brookshire M, Slesnick, F.   "A 1999 Survey Study of Forensic Economists – Their Methods and Their Estimates of Forecast Variables," Litigation Economics Digest, Vol. IV, No. 2, Fall 1999, pp. 65-96 (Attached hereto as Exhibit "B-4").   See also *Crespo v. City of Chicago*, 1997 WL 537341 (N.D. Ill. Aug. 22, 1997) (noting that there is a "lack of general agreement among economists as to what elements should go into a 'life evaluation.'"); *Saia v. Sears Roebuck and Co., Inc.*, 47 F. Supp. 2d 141, 147 (D. Mass. 1999).

2.8     Dr. Smith also stated that his analysis was based on a life expectancy of 80.5 years.  (Smith Report, p. 3)   Dr. Smith has previously testified that he develops a financial number that is "generic", meaning he applies it as the "standard figure for the average person."   (See Deposition of Dr. Smith in Tremaine v. Medtronic dated March 4, 2008 at 80:7-12 attached hereto as Exhibit B-5)  Apparently, to Dr. Smith, every life is worth the same in economic terms.   From this $4.1 million dollar figure, he calculates values to populate several tables projecting the Lower and Upper Ranges of the present value of plaintiff's reduction of life, although his report is silent about how he performs his calculations.  (Smith Report, Tables 1-6)   No matter how artfully crafted, this model assumes too much and arrives at a conclusion while providing very little factual predicate.   "While the statistical approach may be useful for writing regulations, courts have found it rather 'callous and unhelpful' for jurors assessing individual lives. *Kurncz, supra.* at 390, *citing Hein v. Merck & Co., Inc.*, 868 F.Supp. 230, 233 (M.D. Tenn. 1994).

Dr. Smith's report and the opinions contained therein fails to meet the *Daubert* standard for admissibility.

2.9     <u>No Way To Test</u>.   There is no proper way to test or validate Dr. Smith's theory.   "Some predictions or assumptions of economists can be validated at least in retrospect; e.g., life expectancy, inflation, etc.   This is not true for the valuation of hedonic damages."  Kurncz, 166 F.R.D. at 389.   The district court in Kurncz further elaborated that this "willingness to pay" model incorrectly assumed that people could "consciously consider and accurately evaluate the risks they face and the degree of harm from the risks when making purchases or choosing a job."  Id. at 389.   This simply is not so.   Consider, for example, the brave men and women who make up our all-volunteer military.   They volunteer to face significant risk, and for far less pay than many civilian jobs they could get.   Under Dr. Smith's rationale, they should insist on more pay to face increased risk.   Carried to its extreme, a person should be willing to die or suffer the rest of his life in hopeless pain and despair in return for some fraction of $4.1 Million.   The concept is ridiculous.

2.10    <u>Peer Reviewed Articles Criticize Smith's Theory</u>.   Contrary to what Dr. Smith presents in his report, the peer review of Dr. Smith's methodology applying "value of life" to the personal injury cases is not positive.   Rather, while economists agree that the "value of life" approach is a valid approach for use in regulatory decisions, in a free market context, where individuals are choosing to make a tradeoff between money and reduced risk through safety improvements; this is not the case for a retrospective look on an individual's reduction of life.   W. Kip Viscusi, Misuses and Proper Uses of Hedonic Values Of Life In Legal Contexts, Journal of Forensic Economics 13(2), 2000, pp. 111-125 (attached hereto as Exhibit "B-6").   Dr. Viscusi is recognized even by Dr. Smith as an authority in this field and Dr. Smith cites to several of Dr. Viscusi's writings as being in support of his theory (Smith report, p. 2 and 5), but Dr. Viscusi actually

discourages the use of this method in the personal injury litigation context.  Specifically, he states that this approach is wholly inappropriate in the context of evaluating the reduction of the value of life for one person.

> "The attractive features of the value-of-life approach might lead one to think that carrying them over to the courtroom and using them for the estimate for setting damages in situations of wrongful death would be appropriate as well.  However, such a use of the value-of-life approach is typically incorrect as it is currently applied."  Viscusi, p. 116.

2.11   Potential Rate of Error.  Dr. Smith's model and its assumptions are subject to a serious potential rate of error.  This model draws figures from studies that are evaluating how individuals act when choosing between a safer product and a less safe product to extrapolate a hedonic value of life.  As one District Court astutely noted, "[T]he truth is that we often fail to avoid risks even when they involve little cost.  This is probably because we believe in our own immortality, sharing a kind of "that only happens to other people" mentality."  *Hein, supra,* at 234.  *See also* M*ercado,* 974 F.2d at 871 (noting that people are motivated by more than monetary incentives, such as police officers who may undertake more dangerous jobs because they are motivated by civic duty rather than the monetary value they may place on their lives).  Therefore, a study evaluating how much individuals would pay for side air bags in their cars, for example, are prospective evaluations that evaluate how much people will pay in exchange for safety, not how much an individual's life is worth with or without the air bags.

2.12   Further exacerbating the potential rate of error in Dr. Smith's methodology is that the "willingness to pay" model tries to maintain a veneer of scientific neutrality by talking about a statistically average individual while also trying to project the subjective reduction of value of life in a particular plaintiff's life.  See *Kurncz,* 166 F.R.D. at 390;

*Bereton v. U.S.*, 973 F.Supp. 752, 758 (E.D. Mich. 1997).   In this case, Dr. Smith's model can, at best, only account for the statistically average individual.   In spite of Dr. Smith's careful posturing that the jury could calibrate the numbers, injecting even more uncertainty and potential for error, the inescapable conclusion is that his model is scientifically unable to calculate the value of Charles McGuire's life.   Indeed, it does not even try to do so.   It merely "invites the jury to abandon its own perceptions of what is important to the particular case and its value in favor of guesswork as to how his figures have already taken those factors into consideration."   *Kurncz, supra.* at 390.

2.13   Another huge potential for error exists in the way Dr. Smith derives the reduced value of life depending on the "lower and upper estimated impairment rating" which somehow must be tied to plaintiff's own subjective situation.  (Smith Report, p. 3) Dr. Smith claims that in order to perform his evaluation and develop his lower and upper impairment ratings, he reviewed the following materials:

- the Summary Report from Dr. Craig H. Lichtblau dated July 22, 2008;

- tax information from 2005 through 2007;

- profit and loss statements from 2007 and 2008;

- excerpts from Charles McGuire's deposition;

- an interview with Charles McGuire on August 19, 2008; and

- the case information form.  (Smith Report, p. 1)

It is unclear if Dr. Smith then used his own subjective judgment to calculate his ranges, relied on something in Dr. Lichtblau's report (which is itself, subject to serious objection) or used the plaintiff's tax returns, income and data from the interview with Mr. McGuire in any way at all.  His report provides no explanation of his calculations, no basis for his use of Dr. Lichblau's report, and no foundation to support his personal evaluation of disability rating.  Dr. Smith's "assumed impairment rating of 10 percent to 20 percent" is not explained by Dr. Smith or supported by any facts. (*see* Smith Report, p. 3) Nor is Dr.

Smith qualified to make such an assessment.  Any attempt to do so would invade the province of the trier of fact.  There is simply no verifiability in his method or his results.

2.14. <u>Not Helpful to the Trier of Fact</u>.  Perhaps recognizing that his methodology would be seriously questioned despite his conclusory statements about its admissibility, Dr. Smith adds a caveat at the end of his report, stating that these "estimates are provided as an aid, tool and guide for the trier of fact."  (Smith Report, p. 4)  He also states that the jury may "weigh other factors to determine if these estimated losses for Charles McGuire should be adjusted because of special qualities or circumstances that economists do not yet have a methodology for analysis."  (Smith Report, p. 3)  However couched or labeled Dr. Smith's methodology at best, does not help the jury determine the value of life, and at worst, serves to confuse and prejudice.  Instead, as Professor Viscusi opined about the misleading allure of having an expert testify, a certain dollar amount "provides an anchor for the jury," such that if the jury has doubts about the methodology, the jury will simply split the difference in the proposed amount – in this case, the $4.1 million dollar figure tossed up by Dr. Smith.  Viscusi, p. 121.  This is exactly the kind of prejudicial error that must be excluded.  Fed.R.Evid. 403 (relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury).

2.15   Further, the evaluation of the loss of the value of life as an element of recoverable damages is an evaluation that the jury can undertake based on their own collective experiences and knowledge. *Sullivan v. U.S. Gypsum Co.*, 862 F.Supp. 317, 321 (D. Kan. 1994).  Many courts have agreed specifically that Dr. Smith's opinions are not admissible. In *Saia, supra*, 47 F. Supp. 2d at 149, the District Court held that Dr. Smith's testimony would "not assist the jury in understanding the evidence or determining any fact in issue." *See, e.g., Dorn v. Burlington Northern Santa Fe R.R. Co.*, 397 F.3d 1183, 1195 (9th Cir. 2005) (agreeing that Dr. Smith's testimony is not

helpful and will invade the provide of the jury); *Davis v. Rocor Int'l*, 226 F. Supp. 2d 839 (S.D.Miss. 2002) (excluding Dr. Smith's testimony because plaintiffs could not show that it would assist the trier); *Kurncz, supra.* at 390 (rejecting Dr. Smith's method); *Crespo v. City of Chicago*, 1997 WL 537343, *2 (N.D. Ill. Aug. 22, 1997) (even if hedonic testimony was reliable and valid, the testimony still does not assist the jury because it could determine for itself the value of life*); Ayers v. Robinson*, 887 F.Supp. 1049, 1064 (N.D. Ill. 1995) (holding that the "willingness to pay" model cannot possibly assist the jury in calculating damages).

2.16   Therefore, Dr. Smith's self-serving overtures about the admissibility of his testimony regarding hedonic damages are irrelevant.   Dr. Smith's testimony must be excluded.

### B. Dr. Smith's Testimony Is Contrary to Texas Law

2.17   Under Texas law, hedonic damages may not be claimed as a separate element of damages – they may only be considered as a factor in assessing other damages. *See, e.g., Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.2d 757, 766 - 770 (Tex. 2003); *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 674 (Tex App. – Texarkana 1991, writ denied); Mo. Pac. R.R. Co. v. Lane, 720 S.W.2d 830, 834 (Tex. App. – Texarkana 1986, writ denied); *Spohn Hosp. v. Mayer*, 72 S.W.3d 52, 67 (Tex. App. – Corpus Christi 2001), rev'd on other grounds, 104 S.W.2d 878 (Tex 2003); *Brookshire. Bros., Inc. v. Wagnon*, 979 S.W.2d 343, 353 (Tex App. Tyler 1998, pet. denied).

2.18   Dr. Smith's report consists of eight pages of boilerplate language apparently used in all of his reports (Smith pp. 1-8), a one page summary of the alleged

dollar value of plaintiff's "loss of enjoyment of life", which contains no explanation or analysis (Smith Report, p. 9), and six tables, which also fail to provide any analysis. (Smith Report, Tables 1 – 6).  Nowhere does Dr. Smith's report make reference to any specific category of damages, such as an alleged disability or alleged pain and suffering, other than referring to an "assumed" impairment rating.  It is clear from the report that Dr. Smith has estimated plaintiff's alleged hedonic damages as a completely separate category of damages, in direct contravention of Texas law.  If allowed to testify, Dr. Smith's testimony would result in the exact situation that the Texas courts have sought to avoid: confusion of the jury and a significant risk of a double recovery for the same alleged damages.  Dr. Smith's testimony and report must be excluded as contrary to established precedent.

2.19.  Based on the foregoing, the Defendants respectfully request that this Court enter an Order excluding the economic damage opinion testimony of plaintiff's expert, Stan V. Smith, Ph.D., as well as his report.

### III.   Thomas D. Thunder (Proffered Audiologist Expert)

3.1    Mr. Thunder's Testimony must be excluded because his expert report is irrelevant to any fact that is of consequence to this action and, in contravention of Fed. R. Evid. 702, and fails to even provide an opinion that could assist the trier of fact. Copies of Mr. Thunder's report, Curriculum Vitae and list of cases in which he testified are attached hereto as Exhibit C-1, C-2 and C-3, respectively.  In determining the relevance of proffered evidence and whether it would assist the trier of fact, this Court must determine whether the expert report and proposed testimony of Thomas Thunder fits the facts in dispute.  See *Daubert*, 509 U.S. at 590-91.  In other words, the expert

testimony must "logically advance a material aspect of the proposing party's case." *Daubert* 1315.

3.2    Here, Mr. Thunder has been proffered to support a claim that the stall warning horn in the subject airplane was somehow inaudible.   See Expert Report of Thomas Thunder dated August 7, 2008 ("Thunder Report"), at p. 1 (Exhibit "C-1"). However, Plaintiff's Amended Complaint removed Plaintiff's prior product liability claims and is completely devoid of any claim or allegation regarding the subject airplane's emission of a stall warning alarm.   Since Plaintiff is not pursuing a claim regarding the stall warning horn, Mr. Thunder's proposed testimony is not relevant to this action and is not material to Plaintiff's case.   See Fed. R. Evid. 402; see also *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant . . . .") (internal citation and quotation marks omitted).

3.3    Mr. Thunder's Expert Report also fails to meet the requirements of Fed. R. Evid. 702.  He provides no opinion that would assist the trier of fact in understanding the relevant issues and evidence.   Actually, he provides no opinion at all.   Instead, after assuming that the warning horn was inaudible (despite it having been heard at various times by all three occupants of the aircraft) he simply concludes that "I cannot state with confidence the cause of the alarm's inaudibility.  In all likelihood, multiple elements may have played a role . . . ."   Thunder Report, at p. 4.  Mr. Thunder's admission that the outstanding factual issues are too numerous to provide a reliable expert opinion on this issue demonstrates that there are "[in]sufficient facts . . . [to] warrant [the report's] inclusion as evidence."  *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).

3.4     The simple fact that Mr. Thunder has not issued an opinion at all renders his report defective and precludes his testifying at trail.  His admission that he cannot state an opinion "with confidence" merely establishes beyond all doubt that his testimony is of absolutely no value to the trier of fact. Mr. Thunder's proffered testimony and report should be excluded.

## IV.  Douglas Carmody (Proffered Pilot Expert)

4.1     Mr. Carmody is presented to this Court as an expert pilot.  His report is attached hereto as Exhibit D.  In his report, Mr. Carmody relates several opinions about Defendant Nelson's instruction of Plaintiff, UNDAF's training of Nelson, and Nelson's actions during the mishap flight.   He also purports to give opinions on the legal responsibilities of the parties.  It is this latter category of opinions that are objectionable and should be stricken.

4.2     Generally, the Federal Rules of Evidence do not permit the admission of legal conclusions by a witness, nor do they permit an expert witness to usurp the role of the court by instructing the jury on the the applicable law.  *U.S. v. Milton*, 555 F.2d 1198, 2 Fed.R.Evid.Serv. 100 (5th Cir. 1977) .  In his report, Mr Carmody attempts to offer legal opinions and conclusions in at least two areas.

4.3     First, Mr. Carmody concludes that Defendant Nelson was the "Pilot in Command" on the flight in question.  The term "Pilot in Command" is a defined term contained in the Federal Aviation Regulations.  Part 1, Section 1.1 of the Federal Aviation regulations, General Definitions, defines the term this way:

"**Pilot in Command** means the person who:

(1)  Has final authority and responsibility for the operation and safety of the flight;

(2)  Has been designated as pilot in command before or during the flight; and

(3)  Holds the appropriate category, class and type rating, if appropriate, for the conduct of the flight."

Whether or not Defendant Nelson was the Pilot in Command on the mishap flight is a legal conclusion.  Mr. Carmody's conclusion that "Mr. Nelson was considered Pilot in Command (PIC) by the Federal Aviation Administration…" (Carmody Report, para 1, (a)) is an inadmissible conclusion of law and should be stricken.

4.4    It should be noted by the Court that Mr. Carmody finished the above quoted sentence with a conclusion that "UND/Cirrus Design Corp." also considered Mr. Nelson to be Pilot in Command on the flight in question.  It is improper for an expert to speculate about what others did or did not consider to be true, so that portion of Mr. Carmody's conclusion should likewise be stricken.

4.5    Mr. Carmody also makes legal conclusions about the "operational control" of both the training program and the Aircraft.  In paragraph 3 of his report, Mr. Carmody states the following:

"No company, including Cirrus Design, can delegate their responsibility for flight safety to another company to avoid liability.  Just as Jeff Nelson cannot claim that he delegated his duties for ensuring a safe flying environment to his student, nor can Cirrus Design claim they delegated their duties for flight safety to UNDAF.  If Cirrus provides transition training, they must do so safely, whether or not another company becomes involved.  If another company fails in providing a safe flight training experience, Cirrus likewise fails.  Had Cirrus and UNDAF properly

- 16 -

matched an experienced instructor with a low time student, or had they denied certification to Jeff Nelson who has shown he lacks competence for recovering from an induced maneuver, this accident would not have occurred.  That they failed these requirements makes Cirrus responsible also." (Carmody Report, last subparagraph of para. 3)

The above quoted portion of Mr. Carmody's report is objectionable for a variety of reasons.  First it is a conclusion of law.  Second, it is a conclusion based on incorrect principles of law.  Third, it is based on nonexistent facts.

4.6    Mr. Carmody's conclusion that certain combinations of circumstances and actions render one or more of the Defendants liable in this case is a pure conclusion of law.  His opinions are not those of an experienced experts establishing the standard of care in the industry and testifying as to whether or not the Defendants breached that standard of care.  Instead, based on his understanding (apparently based on incorrect information) Mr. Carmody concludes that Cirrus Design is strictly liable and/or vicariously liable for the outcome of the flight in question.  Mr. Carmody is not qualified to make that conclusion, has no foundation upon which to make that conclusion, and is not permitted by the Federal Rules of Evidence to render such testimony in any event.

4.7    Mr. Carmody renders his legal conclusions on some theory of strict liability based on "non-delegable duties".  While he does not indicate what State or Federal law he might be relying on for his opinions, Texas law certainly contains no such basis for liability on the facts of this case.  Defendants are unaware of any law that would require a person to "ensure a safe flying environment".  Texas law requires people providing flight instruction to behave in a reasonably prudent manner.  No one can ensure a safe flying environment, a safe driving environment or even a safe sitting on the couch

watching TV environment, and no law known to these Defendants makes them liable for an alleged failure to do so.

4.8    Mr. Carmody's opinions are based on demonstrably incorrect facts, or founded on such vague assertions that neither these Defendants nor this Court can determine what they are.    In the first category, for example, Mr. Carmody states that "The customer has no knowledge that the instructor is not employed by Cirrus Design Corporation." (Carmody Report, second subparagraph of par. 3)  In fact, each customer is handed a business card at the start of the first lesson identifying the instructor as an employee of UNDAF.  The instructors wear a uniform with a UNDAF logo on their shirt. Each time the customer calls to schedule training, ask a question or otherwise communicate with the training program, the telephone is answered with some identification of UNDAF.    With regard to the vagueness of his factual basis, Mr. Carmody opines that Mr. Nelson should not have been certified as and instructor because "he lacks competence for recovering from an induced maneuver." (Carmody Report, last subparagraph of para. 3)  He offers no explanation for what that could possible mean and, thus, offers no way to evaluate the validity of his opinions.

4.9    Similarly, Mr. Carmody improperly speculates that "[A]ny flight instructor who loses 350 to 400 feet in altitude trying to recover from the beginning of a stall would fail an FAA check ride." (Carmody Report, second subparagraph of par. 1(a))  Mr. Carmody is not, and apparently never has been, an FAA examiner and has no basis for such a blanket statement.  The FAA does not administer accelerated stalls during any

check ride known to these Defendants, so it is impossible to know what the satisfactory performance parameters for such a maneuver might be if they did so.

4.10   Finally, Mr. Carmody's opinion that this accident would never have happened if Mr. Nelson had not been hired as an instructor is purely speculative. Frankly, if Charles McGuire had been flying by himself when he induced the accelerated stall within a few hundred feet of the ground, he most likely would be dead.   The conclusion that Mr. Nelson saved Plaintiff's life by being on the Aircraft is just as plausible as the conclusion that the accident would not have happened if Mr. Nelson was not there.   Mr. Carmody's opinion in that regard is too speculative to pass muster under the Federal Rules of Evidence.

### V.  Craig Lichtblau, M.D. (Proffered Life Care Plan Expert)

5.1   Dr. Lichtblau is the foundation of Plaintiff's house of cards regarding experts.   He is a non-treating physician hired by Plaintiff's attorneys for no reason other than this litigation.   His bias toward the Plaintiff is obvious from the first paragraph in his report.   In his "History of Present Illness", Dr. Lichtblau recites that Plaintiff told him the flight instruction was "provided by Cirrus", that "the flight instructor was inexperienced and should have known how to correct the plane to prevent it from crashing."   See Lichtblau Report, Exhibit E-1, p. 1. Both of these statements are disputed issues of fact in this case and neither has any medical relevance whatsoever.   The fact that Dr. Lichtblau chose to put that information in his report can have no purpose but to bias anyone reading it.

5.2     Basically, Dr. Lichblau is being offered as a witness to introduce volumes of hearsay and medical opinion without production of the underlying medical records or opportunity to cross-examine the people Dr. Lichtblau claims to have interviewed.   The primary opinion expressed by Dr.Lichtblau, used by Dr.McCoin and Dr. Smith for their conclusions, is found on page 7 of his Medical Functional Capacity Assessment, attached as Exhibit E-2.   After performing a battery of physical tests and observing that "this patient has the functional capacity to work 8 hour a day at this time", Dr. Lichtblau concludes"

> "It is my medical opinion as a Board Certified Physiatrist that this patient will have a 10% to 25% reduction in his vocational capacity and at least a five year reduction in his work life expectancy secondary to acute intermittent exacerbations of chronic pain." (Exhibit E-2, p. 7)

5.3     There is absolutely no basis for Dr. Lichtblau's conclusion of a reduction in Plaintiff's vocational capacity.   There is no evidence that Plaintiff has ever, or will ever, miss work due to his residual condition since he returned to work after the accident.   In fact, Charles McGuire has testified that he does not even take medication for pain.   To be precise, Dr. Lichtblau has no evidence that Mr. McGuire has missed work or requires medication to control pain from his injuries.   Dr. Lichtblau does note that Mr. McGuire is a "lawyer and CPA" and provides no explanation for how his ankle injury would impair his job as a lawyer or CPA.     Dr, Lichblau's opinion regarding a reduction in vocational capacity is pure speculation and is not admissible in this case.

5.4     The other role Plaintiff hired Dr. Lichtblau to play is that of Life Care Planner.   In his Continuation of Care, attached hereto as Exhibit E-3, Dr. Lichtblau lists

a number of possible medical care items that Mr. McGuire might have in the future and some estimated costs for those items.  For his support, he cites to his "Documentation Section" which contains Dr. Lichtblau's own statement about a telephone conversation he supposedly had with Dr. Mark Brinker and his physician's assistant, John Cahak.  In his statement, Dr. Lichtblau claims that Dr. Brinker relayed a medical opinion that Charles McGuire would need arthroscopic surgery on his ankle and eventually a fusion operation.  He also relates that it was Dr. Brinker's opinion that Plaintiff would require various therapies, injections and oral medications to control "intermittent exacerbations of chronic pain" and maybe even invasive procedures for future back pain.  Dr.Lichtblau also contends that Dr. Brinker gave him estimated costs for these various medical care items.  See 12 Aug 08 Statement of Lichtblau, Exhibit E-4.

5.5    The problem with allowing Dr. Lichtblau to testify based on this type of evidence is at least two fold.  First, it is hearsay and there is no evidence that it is reliable or the type of information routinely relied upon by members of Dr. Lichtblau's specialty.  Similarly, there is no indication that the costs mentioned therein are normal or reasonable.  Second, Dr. Brinker's medical records contain no such diagnosis or opinions.  Thus, the Court is faced with a decision.  Does it allow testimony based on a hearsay telephone conversation recorded only by a testifying expert hired by Plaintiff, or does it rely on evidence contained in the medical records of treating doctors and hospitals with no stake in the outcome of the litigation?  The law clearly favors the latter.  There is no foundation or indicia of reliability supporting Dr. Lichtblau's Life Care Plan numbers and his opinions in that regard should be stricken.

5.6     Even if Dr. Lichtblau demonstrated a legal basis for his opinions on future medical expenses, it should be noted that he actually provides no opinion in that regard. Instead, all he does is list the universe of possible expenses that Mr. McGuire might face.     He never estimates what the future medical expenses might be within a reasonable medical probability.     Indeed, he has not demonstrated that he is even qualified to do that since he is neither a medical expert in treating the types of injuries sustained by Plaintiff, or the costs of such treatment in Houston, Texas.  If Dr. Lichtblau was permitted to put his list of possible medical expenses in front of a jury, it would merely allow the jurors to become "doctors for the day" and use their own judgment about what treatment will or will not be necessary for Plaintiff in the future.    Thus, the evidence would be more prejudicial than probative and must be excluded under Federal Rule 704.

## VI.  Adrienne Bond (Proffered Expert on Texas Law)

6.1     Plaintiff apparently intends to call Ms. Bond as an expert witness to opine on whether or not Defendant Cirrus is liable for the conduct of Defendants UNDAF and Nelson as a matter of law.   Copies of Ms. Bond's report, Curriculum Vitae and list of cases in which she has testified are attached hereto as Exhibit "F".   Such proffered testimony from Ms. Bond directly violates the limitations placed on expert testimony by Federal Rules of Evidence 702 and 704.

6.2     In her expert report, Ms. Bond indicates that:

"The purpose of this report is to express my expert opinion on certain agency topics, including but not limited to those set forth below:

a.    Is Cirrus Design Corporation ("Cirrus Design") directly responsible as a principal for the conduct of its agent, the University of North Dakota Aerospace Flight School ("UNDAF") and its employees, (who are sub agents of Cirrus Design) specifically including Jeff Nelson ("Nelson") with regard to the events on August 5, 2006 in and around Boyceville, Wisconsin?

b.    Is Cirrus Design vicariously liable as a principal for the conduct of its agent, UNDAF, and sub-agent Nelson under agency theories of apparent authority and *respondeat superior* with regard to the events on August 5, 2006 in and around Boyceville, Wisconsin?"

6.3    The topics on which Ms. Bond wishes to provide testimony go directly to an ultimate issue of law.  Those determinations are for the Court to make.  To allow Ms. Bond's testimony would usurp the Court's role in the trial of this cause and would directly violate Federal Rules of Evidence 702 and 704.  If Plaintiff desires to have Ms. Bond appear as counsel on his behalf to present these legal issues to the Court, he may certainly do so.  However, no witness can instruct the jury on the law.  That is all Ms. Bond's proffered testimony attempts to do.  She should not be allowed to testify.

### VII. Kenneth McCoin (Proffered Loss of Earnings Expert).

7.1    Defendants object to the testimony of Dr. Kenneth McCoin for the simple fact that virtually none of the information upon which he purportedly relies has been produced to Defendants in discovery or disclosures.  Nor is there any factual basis for Dr. McCoin's assumption that Plaintiff, whose profession requires only sedentary work, will miss even a single day at the office as a result of his ankle injury.  Dr. McCoin's report, Curriculum Vitae and list of cases in which he testified are attached hereto as Exhibit "G".  To date, Defendants have not been provided with any evidence of Plaintiff's income, annual earnings or other business activities.  Indeed, Dr. McCoin's report is the

first indication in this entire case that Charles McGuire claims to be a banker!  Even now, Dr. McCoin does not provide any of the data upon which he renders his conclusions.   He does not even describe it.   He does indicate that he uses Dr. Lichtblau's estimate of a reduction in "vocational capacity" and "worklife expectancy" without comment on the reliability or basis of that estimate. (As discussed above, there is no factual basis for Dr. Lichtblau's estimate.)  Experts may only base their opinions on hearsay information when it is credible and the type of information that is normally relied upon by other experts in the field.   There is no indication that any of the information relied upon by Dr. McCoin satisfies that test.

7.2     Dr. McCoin also references the future medical cost estimate of Dr. Lichtblau.  Any testimony related to Dr. Lichtblau's future medical cost estimate must be excluded for the reasons set forth in Section V above.

7.3     Since the Plaintiffs have failed to produce any of the information underlying Dr. McCoin's opinions and conclusions, and Dr. McCoin has failed to establish a foundation for the admissibility of his opinions, his testimony should be stricken in its entirety.

### VIII.  Dr. Mark. R. Brinker (Proffered Medical Expert)

8.1     Dr. Mark. R. Brinker, a treating physician, is identified as a proposed expert in Plaintiff's Expert Disclosure.  (Exhibit "A").  Plaintiff states that Dr. Brinker "may testify about medical treatment, diagnosis, prognosis, and billing and the reasonableness of past and future medical expenses incurred."  See Expert Disclosure,

pp. 7-8.   Plaintiff, however, has failed to provide an expert report for Dr. Brinker, a description of Dr. Brinker's qualifications or list of prior cases in which he has testified as required by Fed. R. Civ. P. 26(a)(2)(B).   As such, Dr. Brinker's proffered expert testimony, in particular his testimony regarding prognosis, future treatment, past medical expenses for treatment he did not provide and estimates of future medical expenses, must be excluded.

Respectfully submitted,

GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas 78216-5057
Telephone:  (210) 349-0511
Facsimile: (210) 349-2760


By:     /s/ Ron A. Sprague
        RON A. SPRAGUE
        State Bar No. 18962100
        rsprague@gendrysprague.com


ATTORNEYS FOR DEFENDANTS, JEFFREY
R. NELSON and UNIVERSITY OF NORTH
DAKOTA AEROSPACE

- and -

JACKSON WALKER L.L.P.
1401 McKinney Avenue, Suite 1900
Houston, Texas  77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221

By:    /s/  Richard E. Griffin
        RICHARD E. GRIFFIN
        State Bar No. 08473520
        rgriffin@jw.com

        ROBERT F. RUCKMAN
        State Bar No. 17367000
        901 Main Street, Suite 6000
        Dallas, Texas  75202
        Telephone:  (214) 953-6000
        Facsimile:  (214) 953-5822

        -and-

        PATRICK E. BRADLEY
        REED SMITH LLP
        136 Main Street, Suite 250
        Princeton Forrestal Village
        Princeton, New Jersey  08540
        Telephone:  (609) 987-0050
        Facsimile:  609) 951-0824

        OLIVER BEIERSDORF
        REED SMITH LLP
        599 Lexington Avenue
        New York, New York  10022
        Telephone:  (212) 521-5400
        Facsimile:  (212) 521-5450


ATTORNEYS FOR DEFENDANT CIRRUS
DESIGN CORPORATION

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2008, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filings to the following:

Mr. Richard E. Griffin
Jackson Walker L.L.P.
1401 McKinney Avenue, Suite 1900
Houston, Texas  77010

Mr. Jack E. McGehee
McGehee ★ Chang
1250 Wood Branch Park Drive, Suite 625
Houston, Texas  77079

Mr. Frederick L. McGuire
Mr. Mark A. Gray
Law Offices of Frederick L. McGuire
730 N. Post Oak Road, Suite 201
Houston, Texas  77024

Mr. Patrick E. Bradley
Reed Smith LLP
136 Main Street, Suite 250
Princeton Forrestal Village
Princeton, New Jersey  08540

Mr. Oliver Beiersdorf
Reed Smith LLP
599 Lexington Avenue
New York, New York  10022

and I hereby certify that on October 3, 2008, I delivered a copy of the foregoing pleading to the following non-registered participants:

None

/s/  Ron A. Sprague
RON A. SPRAGUE